UNITED STATES v. 200 GAMBLING DEVICES.

No. 729.

United States District Court
E. D. Louisiana, New Orleans Division.
Jan. 17, 1952.

John N. McKay, U. S. Atty., Thomas C. Wicker, Jr., Asst. U. S. Atty., New Orleans, La., for plaintiff.

Adams and Reese, W. Ford Reese, New Orleans, La., for defendant.

CHRISTENBERRY, Chief Judge.

### Findings of Fact.

1. On April 17, 1950, the Port Arthur Novelty Company of Port Arthur, Texas, a partnership, composed of Earl Cooper, G. B. McAlpine and A. B. Hamilton, was purchased by George E. Clark and H. M. Rosen for the sum of $50,000. The sale provided for the sale of the business composed of all merchandise, parts, slot machines, marble tables, pinball machines, automobiles, fixtures and equipment used in the business of the Port Arthur Novelty Company, located at 424 Proctor Street, Port Arthur, Texas, and provided for the use of the trade name Port Arthur Novelty Company.

2. On April 11, 1951, Mr. Clark, the managing owner of Port Arthur Novelty Company was made aware of the fact that the operation of slot machines in the State of Texas was to be banned by the Legislature.

3. The Port Arthur Novelty Company, during the period April 17, 1950 until April 11, 1951 sold no slot machines, marble tables or pinball machines at all.

4. Prior to its purchase by Mr. Clark, the predecessor operators and owners of the Port Arthur Novelty Company had been engaged in the same type of business as the Port Arthur Novelty Company continued to be engaged in after Mr. Clark's purchase.

5. The Port Arthur Novelty Company was engaged up until April 11 or thereabouts in the year 1951 exclusively in the operation of coin machine devices. These devices were on location at various points outside of the office of the Port Arthur Novelty Company.

6. The total revenue received during the first year of operation of the Port Arthur Novelty Company under Mr. Clark's supervision was a gross of $192,949.45, of which $93,977.20 was received from slot machines, and of which $98,972.25 was received from marble machines.

7. There was no other revenue received by the Port Arthur Novelty Company during its first year of operation by Mr. Clark which covered the period April 17, 1950 to March 31, 1951.

8. On April 11, 1951, on which date Mr. Clark became aware of the probability of the Legislature of the State of Texas banning slot machines, he decided after conference with his manager and others to liquidate the affairs of the Port Arthur Novelty Company.

9. From April 11 until August 29, 1951, at which time the Port Arthur Novelty Company had disposed of its last piece of gaming equipment, Mr. Clark was constantly in the process of liquidating the entire business known as Port Arthur Novelty Company.

10. The gaming devices, slot machines and other coin machine devices were the property of the Port Arthur Novelty Company. They constituted the fixed assets of the Port Arthur Novelty Company and from April 11 until August 29, 1951 the Port Arthur Novelty Company was in the process of realizing upon these fixed assets.

11. At no time during the period when Mr. Clark was the managing owner of the Port Arthur Novelty Company, nor at any time when his predecessors operated the Port Arthur Novelty Company was that company engaged in the business of buying slot machines or other gaming devices for the purpose of reselling them in the ordinary course of business.

12. All of the transactions engaged in by the Port Arthur Novelty Company while that company was operated by Mr. Clark are contained in the stipulation filed in the record herein.

13. Since the slot machines, marble tables and other coin devices owned by the Port Arthur Novelty Company were not held for sale to customers in the ordinary course and trade of their business, the machines represented the fixed assets of the company and as such the Bureau of Internal Revenue had approved depreciation claimed on those fixed assets.

### Conclusions of Law.

On September 10, 1951, U. S. Government Agents served a seizure warrant on Mr. M. E. Webre, United Fruit Company Wharf, Poydras Street and the River in the City of New Orleans. Custody and control of these machines were maintained by the Government Agents until the 200 slot machines, which was the property seized, were delivered on September 11 to the Dupuy Warehouse. This seizure is predicated pursuant to the provisions of Public Law 906 of the 81st Congress, 64 Stat. 1134, 15 U.S. C.A. § 1171 et seq., and the sole cause to be determined by this Court is whether or not the Port Arthur Novelty Company, owner of these 200 slot machines, was a manufacturer of or dealer in gambling devices as set forth in Section 3 of Public Law 906 of the 81st Congress, which reads, as follows: "Upon first engaging in business, and thereafter on or before the 1st day of July each year, every manufacturer of and dealer in gambling devices shall register with the Attorney General his name or trade name, the address of his principal place of business, and the addresses of his places of business in such district. On or before the last day of each month every manfacturer of and dealer in gambling devices shall file with the Attorney General an inventory and record of all sales and deliveries of gambling devices as of the close of the preceding calendar month for the place or places of business in the district. The monthly record of sales and deliveries of such gambling devices shall show the mark and number identifying each article together with the name and address of the buyer or consignee thereof and the name and address of the carrier. Duplicate bills or invoices, if complete in the foregoing respects, may be used in filing the record of sales and deliveries. For the purposes of this Act, every manufacturer or dealer shall mark and number each gambling device so that it is individually identifiable. In cases of sale, delivery, or shipment of gambling devices in unassembled form, the manufacturer or dealer shall separately mark and number the components of each gambling device with a common mark and number as if it were an assembled gambling device. It shall be unlawful for any manufacturer or dealer to sell, deliver, or ship any gambling device which is not marked and numbered for identification as herein provided; and it shall be unlawful for any manufacturer or dealer to manufacture, recondition, repair, sell, deliver, or ship any gambling device without having registered as required by this section, or without filing monthly the required inventories and records of sales and deliveries."

To this Court obviously the Port Arthur Novelty Company was not engaged in the manufacture of any devices described in Public Law 906. In addition, the Port Arthur Novelty Company was not a dealer in any of the devices defined in Public Law 906. To this Court the term "dealer" has a well defined and commonly understood meaning. A dealer, in the common acceptation, and, therefore, in the legal meaning of the word, is not one who buys to keep or makes to sell, but one who buys to sell again; one who buys the *product* in quantities and parcels it out by sale in lesser amounts. The fixed assets, that is, the coin machine devices owned by the Port Arthur Novelty Company were not the products of that company. They were the fixed assets of that company. A dealer is also, in the eyes of this Court, a person who buys and sells for the purpose of gain and profit or who buys to sell to others at a profit and although a man commences to be a dealer from the moment when he buys the article *with an intention to sell it again,* the term implies a habitual course of dealing and considered from this viewpoint has been defined as meaning one who habitually and constantly, as a business, deals in and sells any given commodity.

This Court is of the opinion that the business carried on by the Port Arthur Novelty Company does not fall within any prohibition of Public Law 906 and the Court is further of the specific opinion that the Port Arthur Novelty Company was not a manufacturer of or dealer in gambling devices.